# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SONY MUSIC ENTERTAINMENT, ALAMO RECORDS, LLC, ARISTA MUSIC, ARISTA RECORDS, LLC, LAFACE RECORDS, LLC, RECORDS LABEL, LLC, SONY MUSIC ENTERTAINMENT US LATIN, LLC, ULTRA RECORDS, LLC, VOLCANO ENTERTAINMENT III, LLC, and ZOMBA RECORDING, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>UNCHARTED LABS, INC., d/b/a Udio.com and JOHN DOES 1-10,<br><br>Defendants. | Case No.: 1:26-cv-6120<br><br>**<u>COMPLAINT</u>**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Sony Music Entertainment ("SME"), Alamo Records, LLC ("Alamo"), Arista Music, Arista Records, LLC ("Arista Records"), LaFace Records, LLC ("LaFace"), Records Label, LLC ("Records Label"), Sony Music Entertainment US Latin, LLC ("SME US Latin"), Ultra Records, LLC ("Ultra"), Volcano Entertainment III, LLC ("Volcano"), and Zomba Recording, LLC ("Zomba" and collectively with SME, Alamo, Arista Music, Arista Records, LaFace, Records Label, SME US Latin, Ultra, and Volcano, "Plaintiffs"), by and through their undersigned counsel, file this Complaint against Uncharted Labs, Inc. ("Udio") and allege as follows:

## <u>NATURE OF THE ACTION</u>

1. This is the second action brought by an affiliated group of record companies to vindicate their rights in the enormous number of copyrighted sound recordings that Udio copied without permission to train the commercial artificial intelligence ("AI") models that power its generative AI service. Because Udio concealed the contents of its training data, the complaint in

the previous action identified a minuscule, illustrative fraction of the recordings Udio had actually copied. Though the 30,117 sound recordings asserted in this action may more closely reflect the breadth of Udio's infringement, in reality they remain only a small portion of Plaintiffs' works that Udio infringed.

2. Like the prior lawsuit, this case concerns Udio's generative AI service, which allows users to generate digital music files that sound like genuine human sound recordings in response to basic inputs. The capacity for a generative AI service, like Udio's, to produce convincing imitations of genuine sound recordings starts with copying a vast range of sound recordings. In Udio's case, this involved copying an enormous volume of copyrighted sound recordings, including those owned or controlled by Plaintiffs, and ingesting them into its AI models. Udio did so without seeking or obtaining permission from the rightsholders who own those recordings, including Plaintiffs. It obtained many of these recordings in the first instance by unlawfully "stream ripping" them from YouTube in circumvention of the technological measures designed to prevent exactly such unauthorized access.

3. Foundational principles of copyright law dictate that copying protected sound recordings for the purpose of developing a commercial AI product like Udio's requires permission from rightsholders. Otherwise, such AI offerings will erode the value of the artistic works that comprise the essential raw materials that allow them to function in the first place. If left unmoored from existing and longstanding legal constraints, such products could supplant, rather than support, genuine human creativity. As observed in the intervening time since Plaintiffs initiated the original lawsuit against Udio, when those who develop such a service steal copyrighted sound recordings, the service's synthetic musical outputs inevitably saturate the market with machine-generated content that will compete with, cheapen, and ultimately drown out the genuine sound recordings on which the service is built.

4. In June 2024, Plaintiffs, alongside a group of other record companies, first sued Udio for its unauthorized use of their sound recordings to train its commercial AI models. *See Sony Music Entertainment v. Uncharted Labs, Inc.*, No. 1:24-cv-04777 (AKH) (filed June 24,

2024) (the "Original Action"). In responding to the allegations in the Original Action, Udio admitted the essential facts underpinning the allegations in this case. Specifically, Udio acknowledged that it built its models by copying and ingesting a vast number of sound recordings that it obtained from YouTube and admitted that those recordings "presumably included recordings whose rights are owned by the Plaintiffs in this case." Udio also acknowledged that its models generate outputs in existing musical styles using insights derived from ingested sound recordings. Udio nonetheless refused to identify the specific recordings on which it trained, which forced Plaintiffs to engage in a forensic analysis of Udio's training data corpus. That analysis identified **hundreds of thousands** of Plaintiffs' copyrighted works within Udio's training dataset, each of which Udio copied without authorization to train a service designed to imitate and compete with the recordings Udio took.[1]

5.      Plaintiffs sought leave to amend their complaint in the Original Action to add additional works Plaintiffs identified through their forensic analysis. On June 29, 2026, the Court denied leave but expressly recognized that "Plaintiffs have the right to seek to stop infringement of, and recover damages for, all copyrighted works." The Court held only that "there is no requirement that it be done in [that] lawsuit." Consistent with the Court's ruling in the Original Action, Plaintiffs bring this suit to vindicate their rights as to the other works Udio infringed.

6.      Udio cannot avoid liability for its willful copyright infringement by claiming fair use. The doctrine of fair use promotes human expression by permitting the unlicensed use of copyrighted works in certain, limited circumstances, but Udio offers imitative machine-generated music—not human creativity or expression. Moreover, the Copyright Act enumerates four factors to assess whether an unauthorized use is fair, none of which favor Udio. These factors are: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. Udio's use of Plaintiffs'

---

[1] All references to discovery materials from the Original Action have been disclosed on the public docket.

copyrighted sound recordings is quintessentially commercial and non-transformative, because the service it developed using Plaintiffs' recordings is designed to output substitutive and directly competitive digital music files that serve the same purpose as, and act as replacements for, Plaintiffs' genuine, human-created recordings. Udio's own Answer in the Original Action confirms as much, boasting that its users have commercially released outputs, including one that was sampled by a prominent producer and taken up by major recording artists. A product built by copying expressive works to produce audio files designed to occupy the same place in listeners' lives and in the marketplace as genuine human recordings is the antithesis of fair use. The remaining factors similarly cut against Udio: it copied the key expressive features of Plaintiffs' copyrighted sound recordings; those copyrighted sound recordings are at the core of copyright protection; and Udio's infringement undermines both existing and potential commercial markets for selling, licensing, and distributing sound recordings. If left unchecked, Udio risks upending whole segments of the legitimate music industry.

7. Tellingly, even as it litigates the Original Action, Udio has reversed course in the marketplace. Since launching its service, Udio has entered into licensing agreements with various rightsholders to use sound recordings as training data for generative AI models. Those agreements confirm both that a functioning market exists for licensing sound recordings for use in connection with generative AI, including to train generative AI models, and that Udio recognizes that using copyrighted sound recordings for this purpose requires permission. Udio's belated embrace of licensing only underscores the unlawfulness of its decision to copy Plaintiffs' copyrighted sound recordings, without a license, in the first place.

8. At its core, this case is about ensuring that copyright continues to incentivize human invention and imagination, as it has for centuries. Achieving this end does not require stunting technological innovation, but it does require that Udio adhere to copyright law and respect the creators whose works allow it to function in the first place.

9. Plaintiffs thus bring this action seeking injunctive relief and damages commensurate with the scope of Udio's massive infringement of their copyrighted sound

recordings.

## THE PARTIES

10.     Plaintiffs together comprise one of the world's foremost record companies, engaged in the business of producing, manufacturing, distributing, selling, licensing, and otherwise commercializing sound recordings in the United States and the world through various media. Plaintiffs have made substantial investments in the development and promotion of some of the most prolific and well-known recording artists in the world.  Plaintiffs' investments extend further to lesser-known artists as well, with an eye toward sustaining the music industry and discovering and supporting new generations of recording artists across all genres and styles.  Pursuant to their relationships with artists, Plaintiffs own or exercise exclusive control over rights in well over a million sound recordings of enormous cultural significance, artistic merit, and economic value.

11.     Plaintiff Sony Music Entertainment is a Delaware general partnership, the partners of which are citizens of New York and Delaware.  SME's headquarters and principal place of business are located at 25 Madison Avenue, New York, New York 10010.  SME owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

12.     Plaintiff Alamo Records, LLC is a Delaware limited liability company with its principal place of business at 25 Madison Avenue, New York, New York 10010.  Alamo is a subsidiary of SME.  Alamo owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

13.     Plaintiff Arista Music is a New York partnership with its principal place of business at 25 Madison Avenue, New York, New York 10010.  Arista Music is a subsidiary of SME.  Arista Music owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

14.     Plaintiff Arista Records, LLC is a Delaware limited liability Company with its principal place of business at 25 Madison Avenue, New York, New York 10010.  Arista Records is a subsidiary of SME.  Arista Records owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

15. Plaintiff LaFace Records, LLC is a Delaware limited liability company with its principal place of business at 25 Madison Avenue, New York, New York 10010. LaFace is a subsidiary of SME. LaFace owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

16. Plaintiff Records Label, LLC is a Delaware limited liability company with its principal place of business at 25 Madison Avenue, New York, New York 10010. Records Label is a subsidiary of SME. Records Label owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

17. Sony Music Entertainment US Latin, LLC is a Delaware limited liability company with its principal place of business at 25 Madison Avenue, New York, New York 10010. SME US Latin is a subsidiary of SME. SME US Latin owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

18. Ultra Records, LLC is a Delaware limited liability company with its principal place of business at 25 Madison Avenue, New York, New York 10010. Ultra is a subsidiary of SME. Ultra owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

19. Volcano Entertainment III, LLC is a Delaware limited liability company with its principal place of business at 25 Madison Avenue, New York, New York 10010. Volcano is a subsidiary of SME. Volcano owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

20. Zomba Recording LLC is a Delaware limited liability company with its principal place of business at 25 Madison Avenue, New York, New York 10010. Zomba is a subsidiary of SME. Zomba owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

21. A non-exhaustive, illustrative sampling of Plaintiffs' federally copyrighted sound recordings that Udio has illegally reproduced is attached hereto as Exhibit A. Plaintiffs currently commercially exploit, and at all relevant times have commercially exploited, all the sound

recordings listed in Exhibit A. Consistent with the Court's order from the Original Action acknowledging that "Plaintiffs have the right to seek to stop infringement of, and recover damages for, all copyrighted works," Plaintiffs expressly reserve the right to expand the list of works that Udio infringed at the appropriate time.

22. Defendant Uncharted Labs, Inc. d/b/a Udio is a Delaware corporation with its principal place of business at 750 Lexington Avenue, Floor 9, New York, New York 10022.

23. Defendants John Does 1-10 are unknown parties who directly copied Plaintiffs' federally copyrighted sound recordings, worked with Udio to copy Plaintiffs' federally copyrighted sound recordings, or have knowledge of Udio's direct infringement of Plaintiffs' federally copyrighted sound recordings and intentionally induced and materially contributed to the infringement by assisting Udio's compiling, scraping, and/or copying of the copyrighted sound recordings for Udio's training data, intentionally promoted or encouraged Udio's infringing conduct or otherwise facilitated it, and/or supervised and financially benefited from Udio's infringement.

**JURISDICTION AND VENUE**

24. This is a civil action seeking damages and injunctive relief for infringement under the Copyright Act, 17 U.S.C. §§ 101, *et seq*., the Music Modernization Act, 17 U.S.C. § 1401, and the Digital Millennium Copyright Act, 17 U.S.C. §§ 1201 *et seq*. As such, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a), based on federal question jurisdiction.

25. This Court has personal jurisdiction over Defendant Udio because its principal place of business, listed as 750 Lexington Avenue, Floor 9, New York, New York 10022, is located within this district.

26. Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because Defendant Udio resides in this district.

## FACTUAL BACKGROUND

### Sound Recordings at Issue

27. Plaintiffs own or exercise exclusive control over copyrights and/or exclusive rights under federal law in and to numerous valuable sound recordings. Exhibit A, attached hereto and incorporated herein by reference, contains a non-exhaustive, representative list of copyrighted sound recordings owned or exclusively controlled by Plaintiffs that Udio has directly infringed (the "Copyrighted Recordings"). Plaintiffs or their predecessors in interest have obtained Certificates of Copyright Registration for each of the Copyrighted Recordings fixed on or after February 15, 1972, identified in Exhibit A.

28. Plaintiffs own or exercise exclusive control over copyrights and/or exclusive rights in and to numerous valuable sound recordings first "fixed" before February 15, 1972, which are protected under the Music Modernization Act ("MMA"), 17 U.S.C. § 1401 *et seq.* In enacting the MMA, Congress directed the U.S. Copyright Office to create a process for rightsholders to submit schedules of pre-1972 sound recordings so that the Copyright Office can publicly index the recordings. 17 U.S.C. § 1401(f)(5)(A)(ii). Once the Copyright Office indexes a work, a rightsholder who sues for infringement of that work can recover statutory damages and attorneys' fees just like any other copyright owner, pursuant to 17 U.S.C. §§ 504 and 505. For each of the pre-1972 Copyrighted Recordings listed in Exhibit A, Plaintiffs have filed with the Copyright Office schedules containing all information specified in 17 U.S.C. § 1401.

### Udio Launches in 2024

29. On April 10, 2024, a team of former researchers from Google DeepMind, an AI research laboratory, launched Udio's AI music generation service, and promoted it as a product that "enables everyone from classically trained musicians, to those with pop star ambitions, to hip hop fans, to people who just want to have fun with their friends to create awe-inspiring songs in mere moments."[2] Udio's then-CEO and co-founder, David Ding, said the vision for Udio's service

---

[2] Udio, *Former Google Deepmind Researchers Assemble Luminaries Across Music And Tech To Launch Udio, A New AI-Powered App That Allows Anyone To Create Extraordinary Music In An Instant*, PR Newswire (Apr. 10, 2024),

is to create "music that sounds indistinguishable from music that's created by professional human producers."[3]

30. Udio's product allows users to enter text prompts or audio files to generate digital music files. Users can prompt Udio's service with a description of the music they want to generate, which can include specifying the genre, lyrics, story direction, and themes to serve as inspiration. Paid subscribers can also prompt Udio's service by uploading a sound recording, which, according to Udio, "greatly enrich[es] your prompting vocabulary."[4] Within seconds, Udio's service processes the user's prompt and generates two digital music files. Once the files have been generated, users can further edit them through the "remix" feature.

31. Originally, Udio's product was free to users, with a limit of 600 music files per month. On May 8, 2024, Udio introduced subscription tiers, with options ranging from $10 a month for 1,200 credits (which equates to 1,200 30-second clips per month), to $30 a month for 4,800 credits (equating to 4,800 30-second clips per month). These pricing and credit options have been calibrated over time, but the fundamental subscription model remains the same. Udio also allows users to create full-length tracks that can be remixed without limit. Put simply, the more digital music files Udio's service produces for its users, the more Udio charges.

**Udio Trains its AI Models Using Copyrighted Recordings**

32. AI models are developed to flexibly perform tasks that are typically expected to require human intelligence to achieve. "Generative AI" is a kind of AI aimed at producing content such as text, images, or (in Udio's case) audio. The generative AI models rapidly advancing today, including Udio's, are based on machine learning models. These models do not employ preset rules for generating outputs, but rather deduce patterns from a large corpus of training content. They

---

https://www.prnewswire.com/news-releases/former-google-deepmind-researchers-assemble-luminaries-across-music-and-tech-to-launch-udio-a-new-ai-powered-app-that-allows-anyone-to-create-extraordinary-music-in-an-instant-302113166.html.

[3] Stuart Dredge, *AI Music Startup Udio Launches Backed By Artists and Instagram's Co-Founder*, Music Ally (Apr. 10, 2024), https://musically.com/2024/04/10/ai-music-startup-udio-launches-backed-by-artists-and-instagrams-co-founder/.

[4] @udiomusic, X (June 5, 2024), https://x.com/udiomusic/status/1798369297758077066.

store these patterns as billions of numerical parameters. In aggregate, these parameters constitute the models. The training process adjusts the parameters so that the models produce content that is based on the content on which the models are trained, including by ensuring that outputs reliably reflect the patterns and associations that the models deduce through training.

33. Consistent with the basic facts of how generative AI works, the content Udio used to "train" its AI models includes millions of copyrighted sound recordings that Udio reproduced without permission from rightsholders, including Plaintiffs. Udio moreover obtained those copies by unlawfully "stream ripping" them from YouTube and circumventing technologies specifically designed to prevent unauthorized access to the Copyrighted Recordings. Udio could not have built models capable of producing audio so similar to the Copyrighted Recordings without the initial act of copying those recordings. Indeed, Udio admitted that in order for its AI tool to generate outputs "in long-established artistic genres," its models "must" in their training phase "have encountered and identified common patterns from prior examples." As one of Udio's chief investors has explained, "the only practical way generative AI models can exist is if they can be trained on an almost unimaginably large amount of content, much of which . . . will be subject to copyright."[5]

34. Similar to other generative AI audio models, Udio trains its AI models to produce audio output by generally taking the following steps:

  a. Udio first copies and reproduces massive numbers of sound recordings and associated metadata by unlawfully stream ripping them from digital sources like YouTube despite technologies designed to prevent such piracy. A portion of this vast collection of information forms the input, or "corpus," upon which the Udio AI models are trained. Udio further stores the illicit copies of these sound recordings for further purposes as it sees fit, including to train additional AI models and reference the underlying dataset.

---

[5] Comments of a16z in Response to Notice of Inquiry on Artificial Intelligence & Copyright 5 (Oct. 30, 2023).

b. Udio then "cleans" the copied recordings to remove any material, whether technical or substantive, that it does not wish to include in its AI models and puts the data into standard formats.

c. Udio then makes additional copies and encodes the scraped sound recordings, transforming them into formats that can be used by the AI models.

d. Udio then ingests this corpus of previously copied recordings into its AI models to train them to create outputs.

e. As Udio admits in its Answer in the Original Action, Udio's training process includes additional further technical refinements, which upon information and belief, make further use of the previously copied recordings.

35. After undergoing this training process, Udio's service gains the capacity to generate audio output based on Udio's models, which, as just described, are products of the corpus of sound recordings on which they are trained. When a user prompts Udio's service with a text input (*e.g.*, make a jazz song about New York), the service generates an audio output by deducing what the audio output should sound like based on associations between the prompt and patterns deduced from the corpus of sound recordings on which it was trained. Certain features of the outputs from Udio's models betray that they were trained on particular data—in this case, the Copyrighted Recordings. For instance, Udio's product frequently generates outputs with strong resemblance to the Copyrighted Recordings, a telltale sign that such recordings were included in its training data. Udio is clearly aware that its users are interested in generating outputs that bear resemblance to human expression, as evidenced by the remarks from Udio's current CEO and co-founder Andrew Sanchez indicating that "[t]he vast majority—I mean 90+ percent—go on our platform and ask to make a song in the style of a favorite artist or a favorite song."[6]

---

[6] Tim Ingham, *Udio CEO Andrew Sanchez on 'Walled Gardens' in AI Music, Warner-Suno, and Why He's Skeptical of Attribution Engines*, Music Business Worldwide (May 19, 2026).

36.     In technical terms, by generating outputs that mimic sound recordings in its training corpus, Udio's models reflect the machine-learning phenomenon known as "overfitting." An AI model is "overfitted" when it is too closely adapted to the data on which it was trained, making it difficult for the model to generalize to new data sets. One symptom of overfitting is a model that replicates portions of its training data. To take a simplified example, if a user inputs the prompt "a jazz song about New York" into an overfitted AI model, the model may output a file that closely resembles one of the jazz tracks on which it trained. Udio designed its product in this way, as it could not create a viable product if it was incapable of generating outputs that users find appealing. This infringement cannot be cured by simply loosening the models' fit or by implementing technical guardrails that make it less likely that outputs will match excerpts of the Copyrighted Recordings. In other words, modifying Udio's offering in a way that better conceals its training data would not alter the fact that Udio infringed the Copyrighted Recordings the moment it copied them to create its models. Irrespective of any overfitting issue, Udio's AI models have indelibly memorized the Copyrighted Recordings.

37.     The basic point is that Udio's models require a vast corpus of sound recordings in order to output synthetic music files that are convincing imitations of human music. Udio's corpus includes the body of recorded music that people listen to in their everyday lives. Because of their sheer popularity and exposure, the Copyrighted Recordings had to be included within Udio's training data for Udio's models to be successful at creating the desired human-sounding outputs. Udio's models rely on the Copyrighted Recordings, which have a proven commercial track record, in order to generate outputs that users will enjoy listening to, which in turn sustain Udio's business.

38.     Prior to the filing of the Original Action, Udio's founders had all but admitted that Udio trains on Plaintiffs' sound recordings. Mr. Ding, Udio's former CEO and co-founder, has explained that the only way Udio can "get high-quality outputs" is if it "train[s] on a *large amount of publicly-available and high-quality* music."[7] Udio's model is trained on the "*best quality music*

---

[7] Stuart Dredge, *AI Music Startup Udio Launches Backed By Artists and Instagram's Co-Founder*, Music Ally (Apr. 10, 2024), https://musically.com/2024/04/10/ai-music-startup-udio-launches-backed-by-artists-and-instagrams-co-

that's out there."[8] As Mr. Ding has further explained, Udio trained its model on "good music" that Udio "obtained from the internet."[9]

39.     Mr. Ding has carefully chosen his words to make it sound like Udio is training only on information that is not protected by copyright law. "Publicly-available" is not the same as "public domain." That Plaintiffs' catalogs of Copyrighted Recordings are "publicly-available" does not mean anyone can copy and commercially exploit them with abandon. In fact, copyright law affords copyright owners the exclusive right to reproduce and distribute copies of their sound recordings to the public without relinquishing copyright protection for those sound recordings. Plaintiffs indeed carefully control access to the Copyright Recordings, such that the public does not have unfettered access. Yet, Udio's *modus operandi* is to treat the Copyrighted Recordings as if they were in the public domain, free for the taking without permission or compensation. All the while, Udio requires its users, as part of its terms of service, to grant it a license to train on any lyrics or audio files they submit as prompts.

40.     Around its launch, Udio's unlawful copying of the Copyrighted Recordings into its training data was not lost on even casual users of Udio's product. Indeed, many observers drew this obvious conclusion, expressing alarm over the scope of Udio's unauthorized copying. To provide just a sample:

- "Though neither company will directly confirm or deny it, there is substantial reason to believe that . . . Udio . . . w[as] trained on copyrighted music, without permission[.]" Brian Hiatt, *AI-Music Arms Race: Meet Udio, the Other ChatGPT for Music*, Rolling Stone (Apr. 10, 2024).

---

founder/.

[8] Sharon Goldman, *AI Music May Be Having a Moment, But Human Songwriters Would Like a Word*, Fortune (May 17, 2024), https://fortune.com/2024/05/17/ai-music-training-scraped/.

[9] Kristin Robinson, *Metro Boomin's 'BBL Drizzy' Is More Than a Joke – It Could Signal the Future of Sampling*, Billboard (May 15, 2024), https://www.billboard.com/business/tech/metro-boomin-bbl-drizzy-future-ai-sampling-1235682587/.

- "Because [Udio] do[esn't] reveal their training data, the only way to try to work out what they trained on is to use the product and see whether the output bears any resemblance to copyrighted music.  I've been using Udio, and it turns out that . . . Udio generates output with a striking resemblance to copyrighted music."  Ed Newton-Rex, *Yes… Udio's Output Resembles Copyrighted Music, Too*, Music Business Worldwide (Apr. 18, 2024).

- "You're just literally uploading other works from artists and people into it and then basically asking it to spit out slightly altered versions of that thing so that you yourself can then profit off of it without having to pay an artist[.]"  Anthony Fantano, *Disgusting AI Music App*, YouTube (May 3, 2024).

- "You've probably heard some Udio songs that have been generated that sound suspiciously very similar to a lot of the artists and bands that we all know and love. And, since there's very little transparency here, many of us are left wondering is it possible that Udio has been training its model off of copyright protected music…. What you're going to see in this video is what I believe might be an indication that there is copyright protected sound recordings … within Udio's dataset."  Sync My Music, *Is Udio Reproducing Copyrighted Songs? (Audio Examples)*, YouTube (May 15, 2024).

- "Often, music-making AI models train on copyrighted material without the consent or compensation of its rights holders, a practice that is largely condemned by the music business — even those who are excited about the future of AI tools."  Kristin Robinson, *Metro Boomin's 'BBL Drizzy' Is More Than a Joke – It Could Signal the Future of Sampling*, Billboard (May 15, 2024).

- "While details about the data that trained these AI tools are sparse, there is plenty of reason to believe that they are trained on copyrighted music."  Sharon Goldman, *AI Music May be Having a Moment, But Human Songwriters Would Like a Word*, Fortune (May 17, 2024).

41.     When directly accused of using Plaintiffs' sound recordings, Udio dodged and did not even try to dispute Plaintiffs' allegations.  Beyond this effective concession, Udio obfuscated and claimed that its training data is "competitively sensitive" and constitutes "trade secrets"—a risible contention considering that Udio has claimed the data on which it trains is "publicly-available" and "out there" for all music listeners.

42.     Udio confirmed these facts in answering the complaint in the Original Action.  Udio admitted that its generative AI models were "constructed by showing the program a vast amount of different kinds of sound recordings" and that these models generate outputs that mimic existing styles using "statistical insights regarding those styles that it has derived from many sound recordings."  Udio also admitted that the recordings it ingested to build its models "presumably included recordings whose rights are owned by the Plaintiffs in this case."

43.     Udio did not (and could not) contend that Plaintiffs' recordings were absent from its training data.  It asserted only that the precise contents of that data would be borne out in discovery.  This discovery has since confirmed the presence of **_hundreds of thousands_** of Plaintiffs' recordings in Udio's corpus.

44.     Moreover, Udio did not delete the sound recordings it copied to train its models once training was complete. Instead, Udio retained—and continues to retain—copies of those recordings, including Plaintiffs' Copyrighted Recordings, in one or more stored datasets.  Upon information and belief, Udio's repository of sound recordings functions as a permanent database or central library of copyrighted works.  Udio maintains this library not as a byproduct of any single training run, but as a durable, reusable asset assembled through wholesale, unauthorized copying.  Udio's reproduction of the sound recordings it used to train its models in connection with its maintenance of this library for its own business purposes is non-transformative and clearly not fair use.  Having amassed it, Udio can and does draw on that library as it sees fit—including to train and retrain successive generations of its models, to fine-tune, improve, and test its existing models, and to develop new commercial products and features—each an additional unauthorized use of Plaintiffs' recordings.

**Udio Scraped Copyrighted Recordings from YouTube**

45.     Udio acquired many (if not all) of the copyrighted sound recordings in its training data by illicitly accessing and downloading them from YouTube using a notorious method of music piracy known as "stream ripping."

46.     YouTube is a popular platform for sharing audiovisual content with users. YouTube allows users to "stream" content—playing it as it is retrieved—but, as set forth below, it is not designed to allow and actually prohibits unfettered access to and the making of permanent, unrestricted copies of the content it streams. Plaintiffs upload certain of their copyrighted sound recordings to the Official YouTube Channels for specific artists on YouTube. When doing so, Plaintiffs include information in the description for each copyrighted recording conspicuously identifying their copyrighted status, including the name of the record label that provided the recording, the copyright owner, and the unmistakable "P in a circle," ℗, the international symbol for a copyrighted sound recording.

47.     Like many other music streaming services, YouTube's Terms of Service generally prohibit the unauthorized use of recordings available on its platform.[10] *See Green v. U.S. Dep't of Justice*, 111 F.4th 81, 89 (D.C. Cir. 2024) ("[M]any subscription-based video or music streaming services protect their copyrighted . . . music from unauthorized access by . . . encrypting the accessed media to prevent unauthorized copying*."*). While YouTube facilitates streaming music and offers a substantially restricted download feature for paying subscribers, it does not permit downloading and making permanent, unrestricted copies of the content on the platform. In fact, YouTube employs enhanced technological measures to protect against unauthorized access to and copying of licensed content, such as Plaintiffs' sound recordings. Specifically, YouTube employs a "rolling cipher" encryption measure to control access to such content, preventing external sites or services from directly downloading protected media files. YouTube maintains two different URLs for any given video: the page URL, visible to the user, is for the webpage where the video

---

[10] Youtube, "Terms of Service," https://www.youtube.com/static?template=terms.

playback occurs, and the file URL, not visible to the user, is for the video file itself that is played within the page. The file URL is encrypted using a complex and periodically changing algorithm—the "rolling cipher"—that is designed to impede external access to the underlying YouTube audio, video, or audiovisual files, thereby preventing or inhibiting any downloading, copying, or distribution of such files. In simple terms, the rolling cipher effectively controls a user's access to copies of copyrighted works uploaded to the platform and prevents an ordinary user from creating a permanent, unrestricted download of a sound recording made available on YouTube only for streaming and restricted downloading.

48. Even though YouTube periodically revises the rolling cipher by design, there are illicit tools and services that circumvent the encryption, download audiovisual content available on YouTube, and create copies that can be downloaded and further distributed by users without restriction. This process is commonly known as scraping or "stream ripping." The use of digital tools to circumvent YouTube's rolling-cipher measure and access or download unrestricted copies of copyrighted content made available on YouTube only for streaming and restricted downloading independently violates copyright law. *See UMG Recordings, Inc. v. Kurbanov*, 2021 WL 6492907, at *9 (E.D. Va. Dec. 16, 2021), *report and recommendation adopted,* 2022 WL 20417526 (E.D. Va. Feb. 10, 2022) (noting that "[m]ultiple courts have found that [a] Defendant's Websites are illegal for their stream-ripping functionality.").

49. Nevertheless, Udio utilized such a tool—in particular, YT-DLP—to circumvent YouTube's encryption and impermissibly access, reproduce, and scrape copyrighted recordings from YouTube. Indeed, this unlawful step of stream ripping is the key means by which Udio engages in its first infringing act of reproducing Plaintiffs' sound recordings.

50. Udio's unauthorized extraction, copying, and storage of Plaintiffs' Copyrighted Recordings from YouTube for use in its training data was accomplished by Udio's unlawful circumvention of YouTube's rolling cipher and any other technological measures YouTube may have implemented to prevent the downloading and copying of licensed content.

51. Udio's actions constitute a violation of the Digital Millennium Copyright Act's

anti-circumvention provisions, which state, among other things, that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(A).

**The Scale of Udio's Infringement**

52. Since Udio's launch, Plaintiffs have sought to determine which of their sound recordings Udio copied and used to train its AI models. Given the sheer volume of data required to train AI models of the kind deployed by Udio, Plaintiffs reasonably inferred that Udio's training dataset must have included their copyrighted sound recordings. On April 25, 2024, Plaintiffs sent a letter to Udio requesting that it (1) cease and desist from copying or otherwise using their copyrighted sound recordings, and (2) provide a complete list of all of the materials that it used to develop its AI models. Udio refused to provide Plaintiffs with any information regarding the source or substance of its training data.

53. Given Udio's refusal to disclose any information regarding the contents of its training data, Plaintiffs designed a test before initiating the Original Action that revealed some of their copyrighted recordings that Udio copied into its training data. Specifically, Plaintiffs found that certain patterns of prompts can cause Udio's product to generate digital music files that contain melodic and vocal similarities to well-known copyrighted sound recordings. Following this painstaking trial and error, Plaintiffs used those similarities in the prior pleadings as evidence to demonstrate that Udio trained its models on their copyrighted works.

54. Since then, discovery in the Original Action has clarified the scale of Udio's infringement. As described in public filings in the Original Action, Plaintiffs were able to inspect Udio's source code and training data in a controlled environment in secured rooms located within the office of Udio's outside counsel. Given the extraordinary volume of data at issue, Plaintiffs developed a systematic process for identifying their specific copyrighted works within Udio's training dataset. This process involved employing Audible Magic, an industry-standard audio fingerprinting technology widely used to identify copyrighted audio content.

55. Courts have recognized Audible Magic as a reliable means of identifying

copyrighted audio content and have described its technology as "the most effective available means of content-recognition filtering based on recognizing the unique content of . . . [a recording] and detecting and preventing copying of that content." *Arista Records LLC v. Lime Wire LLC*, 2010 WL 10031251, at *6 (S.D.N.Y. Aug. 9, 2010). Udio itself has partnered with Audible Magic to help identify outputs created using its service.[11]

56. Audible Magic functions by comparing an unidentified audio file (*e.g.*, audio files Udio scraped to compile its training data) to a database of audio fingerprints—in essence, mathematical representations or digital signatures—derived from sound recordings that have been provided to Audible Magic by copyright holders. Each archived fingerprint in the Audible Magic database is unique to a particular sound recording. To identify unknown audio files, users of Audible Magic produce fingerprints of the unknown files and compare those fingerprints to the archived fingerprints stored in Audible Magic's content recognition database. If the audio fingerprint associated with an unknown audio file matches an archived fingerprint in Audible Magic's database, then the unknown audio file reproduces (and matches with) the sound recording from which the archived fingerprint was derived. In the ordinary course of business, Plaintiffs regularly provide their copyrighted sound recordings to Audible Magic to be fingerprinted and used in its content recognition database. Audible Magic is in possession of a copy of each of the Copyrighted Recordings.

57. In the discovery process in the Original Action, Plaintiffs created audio fingerprints of the audio files within Udio's training data and transmitted those fingerprints to Audible Magic to analyze whether they match fingerprints stored in the content recognition database. Using this process, Plaintiffs identified ***hundreds of thousands*** of audio files in Udio's training data that matched sound recordings that Plaintiffs or their affiliates own or control, including without limitation the Copyrighted Recordings.

---

[11] Audible Magic, *Udio Partners With Audible Magic to Fingerprint AI-Generated Tracks and to Check for Infringements*, https://www.audiblemagic.com/2025/04/30/udio-partners-with-audible-magic-to-fingerprint-ai-generated-tracks-and-to-check-for-infringements/.

58.     Plaintiffs reviewed these voluminous Audible Magic match results from Udio's training data and identified a subset of works for which they assert claims in this action. Plaintiffs have disclosed this subset of works on the public docket in the Original Action. However, the scope of Udio's infringement goes far beyond the 30,117 works listed in Exhibit A, which represent only a fraction of Udio's illegal activity. Plaintiffs expressly reserve the right to expand the list of Copyrighted Recordings to capture the full scope of Udio's illegal reproduction and use of their copyrighted sound recordings.

**Udio Cannot Claim Fair Use**

59.     Udio has attempted to justify its pervasive illegal copying of Plaintiffs' sound recordings by claiming fair use.

60.     The fair use doctrine has been coined an "equitable rule of reason" that balances various contextual factors to determine whether an unauthorized use of a copyrighted work is "fair." *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 448 (1984). But Udio cannot launder its conscious stealing of the Copyrighted Recordings for commercial gain with an appeal to equitable principles. Udio understands that what it is doing is wrong and inequitable, which explains why it previously refused to even acknowledge the extent of its unauthorized use of Plaintiffs' sound recordings, why it tried to cover its tracks when users publicized outputs that clearly reflect training on their recordings, why it has at all relevant times required its own users to grant it training licenses for any lyrics or audio files used as prompts, and why Udio has since sought to obtain licenses to use sound recordings as training data for its AI models. In any event, fair use is not a defense for violation of the Copyright Act's anti-circumvention clause. *See Green*, 111 F.4th at 98 ("Fair use has never been held to be a guarantee of access to copyrighted material in order to copy it by the fair user's preferred technique or in the format of the original.") (cleaned up).

61.     Udio's conduct violates the very purposes of the copyright law and runs contrary to the purpose animating the fair use doctrine. The Copyright Act codifies the common-law doctrine of fair use in 17 U.S.C. § 107, which identifies examples of the types of uses that may

qualify as fair, including "criticism, comment, news reporting, teaching . . . scholarship, or research."  These paradigmatic fair uses reflect the policy of ensuring public availability of "literature, music, and other arts" so that other humans can draw on those works to create new ones.  Udio's wholesale copying of countless recordings serves none of these purposes.  Udio's service does not offer "commentary" or "scholarship" or promote human authorship.  Rather, Udio's service copies and ingests copyrighted works to create computer-generated imitations of human expression that do not merit copyright protection.  Udio's motive is brazenly commercial and threatens to displace the genuine human artistry that is at the heart of copyright protection.

62.     Moreover, applying the statutory fair use factors set forth in § 107 demonstrates that Udio's conduct fails to qualify as fair use.  These factors are: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107.

63. The first fair use factor focuses on "the problem of substitution—copyright's bête noire." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 528 (2023). "The use of an original work to achieve a purpose that is the same as, or highly similar to, that of the original work is more likely to substitute for . . . the work," and thus is less likely to constitute fair use. *Id.*



64. Mr. Ding has said Udio's intention is to create "music that sounds indistinguishable from music that's created by professional human producers."[12] In furtherance of this objective, Udio copies Plaintiffs' catalogs of sound recordings and generates digital music files that are designed to entertain, evoke emotion, and stoke passion, just like the genuine sound recordings on which Udio was trained. Udio feeds the Copyrighted Recordings into its AI models not merely to deconstruct their expressive content, but with the explicit aim of imitating these expressive features

---

[12] Dredge, *supra* note 3.

in commercially viable digital music files that serve as substitutes for and compete with the original recordings. Mr. Ding has personally praised users whose Udio files are being marketed to the public on commercial streaming services like Spotify.

65. The use here is far from transformative, as there is no functional purpose for Udio's AI models to ingest the Copyrighted Recordings other than to spit out new, competing audio files. Indeed, Udio's goal was to leverage the Copyrighted Recordings so it could reliably replicate popular music and build a commercially viable product targeting the same consumers that enjoy the sound recordings it unlawfully used to build this product. That Udio is copying the Copyrighted Recordings for a commercial purpose, and is deriving revenue directly proportional to the number of audio files it generates, further tilts the first fair use factor against it. *See id.* at 532–33 ("If an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use, absent some other justification for copying.").

66. The second fair use factor also favors Plaintiffs. This factor recognizes that "certain 'works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied.'" *TCA TV Corp. v. McCollum*, 839 F.3d 168, 184 (2d Cir. 2016) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586 (1994)). There is no doubt that the Copyrighted Recordings are the type of "creative expression for public dissemination [that] falls within the core of the copyright's protective purposes." *Hachette Book Grp., Inc. v. Internet Archive*, 664 F. Supp. 3d 370, 387 (S.D.N.Y. 2023) (quoting *Campbell*, 510 U.S. at 586).

67. So too does the third fair use factor weigh against fair use. "A finding of fair use is more likely when small amounts . . . are copied than when the copying is extensive, or encompasses the most important parts of the original." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 221 (2d Cir. 2015). Udio copies the entirety of the protected sound recordings it sweeps into its training data. Udio then uses these copies of protectable expression to generate audio outputs that resemble the Copyrighted Recordings it ingests.

68.     Turning to the fourth factor, Udio's use of the Copyrighted Recordings poses a significant threat to the market for and value of the Copyrighted Recordings. Licensing is at the core of Plaintiffs' businesses, and Plaintiffs license the Copyrighted Recordings for myriad purposes, including for use in emerging technologies such as streaming services, user-generated content platforms, and other innovative technologies. Udio's unauthorized use of the Copyrighted Recordings threatens to eliminate the existing market for licensing sound recordings, as well as the market for licensing sound recordings to generative AI companies. Rather than license copyrighted sound recordings, potential licensees interested in licensing such recordings for their own purposes could generate an AI-soundalike at virtually no cost. This is an especially aberrant result when the replacement audio file is generated using an AI service, like Udio's, that produced the replacement by infringing the copyrighted sound recording that would otherwise have been licensed. The issue is compounded as the AI-generated outputs compete for consumer engagement and listening time on the very platforms where the recordings used to train are legally available.

69.     Udio's own conduct in the marketplace removes any doubt that a licensing market to use sound recordings as training data exists and that Plaintiffs are entitled to exploit it. Udio has entered into multiple agreements—including with former plaintiffs Universal Music Group and Warner Music Group, as well as Merlin, Kobalt, Believe, and the National Music Publishers' Association—to license copyrighted works as training data for its generative AI models. A company that pays to license the very inputs at issue cannot credibly maintain that no market exists for those inputs, or that any such market is too speculative to be cognizable. The fourth factor encompasses harm to any "traditional, reasonable, or likely to be developed" market for a copyrighted work, *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d Cir. 1994), including derivative markets that "creators of original works would in general develop or license others to develop," *Campbell*, 510 U.S. at 592. The market for licensing sound recordings as training data for AI models is precisely such a market: it is one Plaintiffs are actively participating in, one Plaintiffs reasonably expect to continue exploiting, and one whose existence Udio has confirmed by paying to participate in it.

70.     The market for procuring and using copyrighted works in connection with generative AI is concrete, dynamic, and not hypothetical.  Underscoring the existence of this currently viable and emerging licensing market, myriad other rightsholders have executed licensing agreements with respect to various types of copyrighted works—spanning sound recordings, musical compositions, literary works, news articles, visual works, and others—in the training and outputs of generative AI models.  These ready indications of a vibrant licensing market dispose of any suggestion that requiring Udio to pay for its use of Plaintiffs' recordings would presume the existence of a market that rightsholders cannot reasonably expect to exploit.  As the Second Circuit has explained, an unauthorized use is "less fair" precisely "when there is a ready market or means to pay for the use." *Texaco*, 60 F.3d at 931.  Here, a ready licensing market exists and allowing Udio to take Plaintiffs' recordings for free would destroy it.  No rational company will pay for what it can take for free.  If Udio's unauthorized use is deemed permissible and establishes a norm of unpaid sourcing, storage, copying, and other use of copyrighted sound recordings associated with generative AI, it would usurp the legitimate licensing market and eliminate all incentives to pay for a license for copyrighted sound recordings to train AI models. In short, Udio's conduct threatens to foreclose this licensing market and stunt its continued growth.

71.     As referenced above, Udio's own Terms of Service confirm that Udio understands that using recorded content to train a generative AI model requires a license from the owner of that content.  In the Terms of Service operative in April 2024, two months before Plaintiffs initiated the Original Action, Udio required every user of its service to grant Udio a license to use the material the user uploads—including audio, instrumentals, vocals, and lyrics—to train and improve its AI models.[13]  This mandatory license persists in Udio's current Terms of Service.  In other words, Udio ensures it has secured permission before it will train on content contributed by

---

[13] *See* Udio, Terms of Service § 6.3 ¶ 2 ("[B]y using the Services and uploading Your Content, you grant us and our affiliates, successors, assigns, and designees a license to access, use, host, cache, store, reproduce, transmit, display, publish, distribute, and modify Your Content to operate, improve, promote and provide the Services, including to reproduce, transmit, display, publish, and distribute Output based on your Input Content and to train or otherwise improve or modify our artificial intelligence and machine learnings model(s) related to the Services"), *available at* https://web.archive.org/web/20240409083618/https://www.udio.com/terms-of-service.

its own users. Yet, Udio copied Plaintiffs' commercially released sound recordings to train the very same models without even seeking permission from Plaintiffs. That Udio demands a license to train on the material its users upload, while helping itself to Plaintiffs' recordings for free, confirms both that Udio knew a license was required and that its infringement of Plaintiffs' rights was knowing and willful.

72. Moreover, Udio's product has the potential to generate directly competing digital music files at such speed that it risks overrunning the market for human-made sound recordings, including the Copyrighted Recordings on which it was trained. This competition is ramping up at a breathtaking pace. At the time Plaintiffs asserted the Original Action, Udio's service was already reportedly churning out 10 music files per second, which equals 864,000 files per day, or just over 6,000,000 files per week.[14] Udio's Terms of Service expressly authorize the use of the output generated "for both personal *and commercial* purposes."[15] Users have taken this cue by publishing Udio-generated outputs on music streaming services, where they will compete for plays against real, copyrighted sound recordings. In addition, direct engagement with Udio's service, including listening to outputs on Udio's platform, diminishes the market for Plaintiffs' recordings.

73. This dilution of the market for Plaintiffs' sound recordings by a flood of machine-generated substitutes is precisely the injury the fourth factor exists to capture. The question for purposes of the fourth fair use factor is not merely the harm from Udio's conduct alone, but whether "unrestricted and widespread conduct of the sort engaged in by [Udio] would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590. It plainly would. Courts assessing the use of copyrighted works to train generative AI have recognized that such training inflicts cognizable market harm "by helping to enable the rapid generation of countless works that compete with the originals," irrespective of whether the resulting outputs are themselves infringing. *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026,

---

[14] Tim Ingham, *The Train Has Left the Station: AI Music Platform Udio Is Already Spitting Out 10 Songs a Second*, Music Business Worldwide (May 13, 2024), https://www.musicbusinessworldwide.com/the-train-has-left-the-station-ai-music-platform-udio-is-already-spitting/.

[15] Udio, Terms of Service § 6.3.1, https://www.udio.com/terms-of-service.

1043 (N.D. Cal. 2025). And the competition Udio enables is far removed from the ordinary competition that copyright tolerates: Udio's models are "better able to generate" competing audio outputs "because they are trained on the creative expression in" Plaintiffs' recordings, so "this competition is not 'legitimate.'" *Id.* at 1044. A service that can produce "literally millions of secondary works, with a miniscule fraction of the time and creativity used to create the original works it was trained on," *id.* at 1055, threatens to dilute and ultimately overwhelm the very market for the genuine recordings on which it was built. Udio's blatant theft of vast amounts of copyrighted recordings to train its AI models cannot be considered fair use because it is "directly aimed at replacing the work of human artists with massive quantities of AI-created 'sounds' . . . that substantially dilute the royalty pools that are paid out to artists."[16]

74. The harm Udio is causing goes far beyond these immediate economic consequences. Udio's wholesale theft of the Copyrighted Recordings threatens the entire music ecosystem and the numerous people it employs. It also degrades the rights of artists to control their works, determine whether future uses of their works align with their aesthetic and personal values, and decide the products or services with which they wish to be associated. And it propagates the destructive theory that copyrighted music is free for the taking whenever a new technology claims that seeking and obtaining permission is just too cumbersome. In other words, Udio's conduct is a frontal attack on the very purpose of copyright law to reward human authors and promote their incentives to continue creating copyrighted works.

75. There is room for AI and human creators to forge a sustainable, complementary relationship that promotes human creativity and facilitates the human creations that shape culture, excite the public, and resonate with consumers. This can and should be achieved through the well-established mechanism of free-market licensing that ensures proper respect for copyright owners. Just as other AI companies that have struck licensing deals with copyright owners, copyright law mandates that Udio do the same if it wishes to build a business using the Copyrighted Recordings.

---

[16] Artist Rights Alliance, *200+ Artists Urge Tech Platforms: Stop Devaluing Music*, Medium (Apr. 1, 2024), https://artistrightsnow.medium.com/200-artists-urge-tech-platforms-stop-devaluing-music-559fb109bbac.

76. Since the day it launched, Udio has flouted the rights of copyright owners in the music industry as part of a mad dash to become the dominant AI music generation service. Neither Udio, nor any other generative AI company, can be allowed to advance toward this goal by trampling the rights of copyright owners.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

**(Direct Copyright Infringement of Post-1972 Copyrighted Recordings)**

77. Plaintiffs repeat, reallege, and incorporate the allegations in paragraphs 1–76 as if fully set forth herein.

78. Plaintiffs own or exercise exclusive control over rights in the Copyrighted Recordings, which are an illustrative and non-exhaustive list of some of Plaintiffs' works infringed by Defendant through its development of Udio's service. Plaintiffs have duly registered each of the Copyrighted Recordings.

79. Udio has knowingly infringed Plaintiffs' exclusive rights in copyrighted sound recordings, including but not limited to the Copyrighted Recordings, by reproducing them in violation of 17 U.S.C. § 106(1).

80. Udio does not have authorization, permission, license, or consent to reproduce or otherwise use the Copyrighted Recordings.

81. Udio used the reproductions of the Copyrighted Recordings to train its generative AI models and stores copies of the Copyrighted Recordings for use in connection with post-training, model refinement, product development, and to otherwise serve its commercial interests and business needs.

82. Each of Udio's acts of infringement of the Copyrighted Recordings is a willful violation of 17 U.S.C. § 106.

83. As a direct and proximate result of Udio's infringement of Plaintiffs' exclusive rights, Udio has caused and will continue to cause irreparable injury to Plaintiffs for which Plaintiffs have no adequate remedy at law. Plaintiffs are therefore entitled to injunctive relief and

to either actual damages and Udio's profits or statutory damages pursuant to 17 U.S.C. § 504(c), together with Plaintiffs' costs and reasonable attorneys' fees pursuant to 17 U.S.C. § 505.

## SECOND CAUSE OF ACTION

### (Direct Copyright Infringement of Pre-1972 Copyrighted Recordings)

84. Plaintiffs repeat, reallege, and incorporate the allegations in paragraphs 1–76 as if fully set forth herein.

85. Plaintiffs own or exercise exclusive control over rights in the Copyrighted Recordings, which are an illustrative and non-exhaustive list of some of Plaintiffs' works infringed by Defendant through its development of Udio's service. All of the pre-1972 Copyrighted Recordings have been submitted to and publicly indexed by the U.S. Copyright Office pursuant to 17 U.S.C. § 1401.

86. Udio has knowingly infringed Plaintiffs' exclusive rights in copyrighted sound recordings, including but not limited to the Copyrighted Recordings, by reproducing them in violation of 17 U.S.C. §§ 106(1) and 1401(a)(1).

87. Udio does not have authorization, permission, license, or consent to reproduce or otherwise use the Copyrighted Recordings.

88. Udio used the reproductions of the Copyrighted Recordings to train its generative AI models and stores copies of the Copyrighted Recordings for use in connection with post-training, model refinement, product development, and to otherwise serve its commercial interests and business needs.

89. Each of Udio's acts of infringement of the Copyrighted Recordings is a willful violation of 17 U.S.C. § 106.

90. As a direct and proximate result of Udio's infringement of Plaintiffs' exclusive rights, Udio has caused and will continue to cause irreparable injury to Plaintiffs for which Plaintiffs have no adequate remedy at law. Plaintiffs are therefore entitled to injunctive relief and to either actual damages and Udio's profits or statutory damages pursuant to 17 U.S.C. § 504(c), together with Plaintiffs' costs and reasonable attorneys' fees pursuant to 17 U.S.C. § 505.

**THIRD CAUSE OF ACTION**

**(Circumvention of Technological Measures)**

91.     Plaintiffs repeat, reallege, and incorporate the allegations in paragraphs 1–76 as if fully set forth herein.

92.     Plaintiffs own or exercise exclusive control over rights in the Copyrighted Recordings, which Plaintiffs have uploaded to YouTube.

93.     By "stream ripping" audio files from YouTube, Udio circumvented technological measures implemented by YouTube that effectively control access to copyrighted works in violation of 17 U.S.C. § 1201(a).  Specifically, Udio employed code to access, extract, copy, and download audio files of the Copyrighted Recordings from YouTube without the authorization of Plaintiffs or YouTube, and in violation of YouTube's Terms of Service.

94.     Plaintiffs have been harmed by Udio's violations of 17 U.S.C. § 1201(a), including because Udio's circumvention of YouTube's technological measures has facilitated Udio's ongoing and mass-scale infringement of Plaintiffs' copyrights through its unauthorized use of the Copyrighted Recordings in its training data.

95.     Udio's conduct in violation of 17 U.S.C. § 1201(a) as described herein was and is willful, intentional, and purposeful, in disregard of the rights of Plaintiffs.

96.     As a direct and proximate result of Udio's violations of 17 U.S.C. § 1201(a), Plaintiffs are entitled to either the maximum statutory damages pursuant to 17 U.S.C. § 1203(c)(3)(A) or, in the alternative, their actual damages pursuant to 17 U.S.C. § 1203(c)(2), including Udio's profits from circumvention in amounts to be proven at trial, together with Plaintiffs' costs and reasonable attorneys' fees pursuant to 17 U.S.C. §§ 505 and 1203(b)(4), (5).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request a judgment in their favor and against Udio as follows:

A.     For a declaration that Udio has willfully infringed Plaintiffs' protected sound recordings, including the Copyrighted Recordings.

-30-

B. For such equitable relief under Title 17, Title 28, and/or the Court's inherent authority as is necessary to prevent or restrain infringement of Plaintiffs' protected sound recordings, including a preliminary and permanent injunction requiring that Udio and its officers, agents, servants, employees, attorneys, directors, successors, assigns, licensees, and all others in active concert or participation with any of them, cease infringing, or causing, aiding, enabling, facilitating, encouraging, promoting, inducing, or materially contributing to or participating in the infringement of any of Plaintiffs' exclusive rights under federal law, including without limitation in the sound recordings in Exhibit A;

C. For statutory damages pursuant to 17 U.S.C. § 504(c), in an amount up to the maximum provided by law, arising from Udio's willful violations of Plaintiffs' rights, including in an amount up to $150,000 per work infringed; or, in the alternative, at Plaintiffs' election, Plaintiffs' actual damages and/or Udio's profits from infringement pursuant to 17 U.S.C. § 504(b), in an amount to be proven at trial;

D. For statutory damages pursuant to 17 U.S.C. § 1203(c)(3)(A), in an amount up to the maximum provided by law, arising from Udio's willful circumvention of technological measures in furtherance of its violations of Plaintiffs' rights, including in an amount up to $2,500 with respect to each act of circumvention; or, in the alternative, at Plaintiffs' election pursuant to 17 U.S.C. § 1203(c)(2), Plaintiffs' actual damages and/or Udio's profits from its circumvention, in an amount to be proven at trial;

E. For an award of Plaintiffs' costs and disbursements in this action, including

reasonable attorneys' fees, pursuant to §§ 505 and 1203(b)(4), (5);

F.      For an award of pre-judgment and post-judgment interest, to the fullest extent available, on any monetary award made part of the judgment against Udio; and

G.      For such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury on all claims for which trial by jury is proper.

July 20, 2026

HUESTON HENNIGAN LLP

By: _____
Moez M. Kaba
Mariah N. Rivera
Alexander R. Perry
HUESTON HENNIGAN LLP
1 Little West 12th Street
New York, New York 10014
Telephone: (646) 930-4046
Facsimile: (888) 775-0898
mkaba@hueston.com
mrivera@hueston.com
aperry@hueston.com

Christina V. Rayburn*
HUESTON HENNIGAN LLP
620 Newport Center Dr., Suite 1300
Newport Beach, California 92660
Telephone: (949) 356-6412
Facsimile: (888) 775-0898
crayburn@hueston.com

Rajan S. Trehan*
HUESTON HENNIGAN LLP
523 West 6th Street, Suite 400
Los Angeles, California 90014
Telephone: (213) 788-4340
Facsimile: (888) 775-0898
rtrehan@hueston.com

*Pro hac vice forthcoming

Attorneys for Plaintiffs
Sony Music Entertainment, Alamo
Records LLC, Arista Music, Arista
Records, LLC, LaFace Records, LLC,
Records Label, LLC, Sony Music
Entertainment US Latin, LLC, Ultra
Records, LLC, Volcano Entertainment
III, LLC, Zomba Recording LLC